FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

EBP/RRR: USAO 2019R00626

JUL - 2 2020

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CASE NO.**  GLS-20-1659 |
| | * | |
| **JUSTINA ELENA OLIVERO,** | * | **FILED UNDER SEAL** |
| **a/k/a "Justina Guzman,"** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

*******

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Detective Michael Adami, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrest for offences enumerated in Section 2516 of Title 18 of the United States Code.

2.      The facts set forth in this affidavit are based on my own personal knowledge, information obtained from other individuals including other law enforcement officers, interviews of witnesses, documents and records, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience.

3.      Based on the facts set forth in this Affidavit, there is probable cause to believe that, on the dates described below, in the District of Maryland and elsewhere, **JUSTINA ELENA OLIVERO, a/k/a "Justina Guzman" ("OLIVERO")**, committed 18 U.S.C. § 1344 (bank

1

fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1028A (aggravated identity theft), and 18 U.S.C.
§ 1708 (unlawful possession of stolen mail) (collectively the "Target Offenses").

4.     Because this affidavit is being submitted for the limited purpose of establishing
probable cause in support of a criminal complaint, I have not included each and every fact known
to me concerning this investigation. I have set forth only the facts necessary to establish probable
cause that **OLIVERO** violated the offenses listed above.

## AGENT TRAINING AND EXPERIENCE

5.     I am a Detective with the Montgomery County Police Department ("MCPD"),
serving as a Task Force Officer ("TFO") with the Department of Homeland Security ("DHS")
United States Secret Service ("USSS") National Capital Region Task Force. I have served as a
TFO since February 2018, and I have worked at MCPD since 2003. During this time, I have
worked as an investigator with the MCPD, Investigative Services Bureau, Criminal Investigation
Division, Financial Crimes Section. I have conducted complex criminal investigations into matters
such as bank fraud, embezzlement, identity theft, money laundering, and financial exploitation of
the elderly, and I am a Certified Fraud Examiner ("CFE").

## PROBABLE CAUSE

6.     The U.S. Postal Inspection Service ("USPIS"), MCPD, and Homeland Security
Investigations ("HSI") are conducting an investigation into **OLIVERO** regarding allegations of
mail theft, mail fraud, and aggravated identity theft, involving multiple Maryland victims. As set
forth below, there is probable cause to believe that **OLIVERO** orchestrated three fraud schemes:
(1) an identity theft scheme where she deposited stolen checks into various bank accounts and
withdrew the money; (2) a credit card fraud scheme where she impersonated American Express
customers, ordered emergency replacement cards in those customers' names, and had those cards

2

mailed to her address; and (3) while working at a criminal defense law firm, **OLIVERO** fraudulently convinced the law firm's clients to send her money for services she could not and did not provide.

### *Unlawful Possession of Stolen Mail and Identity Theft Scheme*

7.    In June 2018, MCPD received a complaint of check forgery and mail theft from Victim 1, a resident of Bethesda, Maryland. On December 29, 2017, Victim 1 mailed out check #1790, written from Victim 1's Bank of America account in the amount of $27,000 made payable to the Montgomery County Government for Victim 1's 2018 property taxes. Approximately six months later, Victim 1 learned check #1790 had not been negotiated by the Montgomery County Government. The check was altered, made payable to Victim 2 and Victim 3, and negotiated.

8.    Investigators determined that Victim 1's altered check #1790 was deposited into a TD Bank account ending in 4210 ("ACCOUNT 1"). ACCOUNT 1 was opened in the names of Victim 2 and Victim 3 with an address in Laurel, Maryland ("RESIDENCE 1"). Documents obtained during this investigation revealed that **OLIVERO** was a tenant at RESIDENCE 1 during the same time period that ACCOUNT 1 was opened.

9.    In addition to Victim 1's stolen check #1790, two additional stolen checks were deposited into ACCOUNT 1. On May 29, 2018, Check #26240214, issued from the State of Maryland Comptroller's Office in the amount of $7,000.15 and made payable to Victim 2 and Victim 3, was deposited into ACCOUNT 1. On June 4, 2018, check #53479, issued from Victim 4's Wells Fargo account in the amount of $5,000 and made payable to Victim 2 and Victim 3, was deposited into ACCOUNT 1.

10.    Investigators interviewed Victim 2 and Victim 3, a married couple, at their residence in Potomac, Maryland. Victim 2 and Victim 3 reported that they did not open

3

ACCOUNT 1 and did not authorize anyone to open ACCOUNT 1 on their behalf.  Investigators presented Victim 2 and Victim 3 with a copy of check #1790, which had been negotiated in their names.  Victim 2 and Victim 3 confirmed that they had not seen the check before and had not negotiated check #1790.  In addition, Victim 2 and Victim 3 reported check # 26240214 from the State of Maryland Comptroller's Office was their tax refund check that they never received.

11.     Investigators contacted Victim 4, who resided in Potomac, Maryland.  Victim 4 stated that check #53479 was a convenience check[1] associated with Victim 4's Capital One Credit Card.  Victim 4 reported that Victim 4 never received check #53479 in the mail and did not authorize anyone to issue the check on Victim 4's behalf.

12.     According to TD Bank records, there were two cash withdrawals from ACCOUNT 1.  The first withdrawal occurred on May 30, 2018, for $5,000 and the second withdrawal occurred on June 6, 2018, also for $5,000.  Both withdrawal slips displayed the name "Justina Guzman" and both withdrawal slips were signed "Justina Guzman."  Two checks were also issued from ACCOUNT 1.  On or about May 28, 2018, check #0098, made payable to Individual 1 in the amount of $1,750.00, was negotiated against ACCOUNT 1.  "Security Deposit" was written on the memo line on Check # 0098.  On May 29, 2018, Check #0099, also made payable to Individual 1 in the amount of $1,750.00, was negotiated against TD Bank ending 4210.  "Rent for June" was written on the memo line of Check #0099.  Investigators contacted Individual 1, who worked for a real estate company located in Columbia, Maryland.  Individual 1 advised that **OLIVERO** provided both checks (#0098 and #0099) as payment for a certain rental property located in Laurel, Maryland ("RESIDENCE 2").  The lease agreement for RESIDENCE 2 listed **OLIVERO** and

---

[1]Convenience checks are blank checks that lenders, usually credit card issuers, offer to their customers to access lines of credit.

Individual 2 as tenants for a twelve-month period, from June 2018 to May 2019.  The lease agreement for the property stated that the security deposit and first month's rent were each in the amount of $1,750.

13.     On or about September 14, 2018, law enforcement officers executed a state search warrant at RESIDENCE 2.  During the search, **OLIVERO** was present at the address.  **OLIVERO** was arrested for an unrelated outstanding arrest warrant and transported to the Laurel Police Department, where she was interviewed.   After being advised of her Constitutional rights, **OLIVERO** admitted to obtaining the stolen checks from an individual named "James" and admitted to depositing Victim 1's $27,000 stolen check into a TD Bank account in the names of Victim 2 and Victim 3.  **OLIVERO** further provided investigators with her phone number ("TELEPHONE 1").

14.     As a result of the search and seizure warrant at RESIDENCE 2, numerous items of evidentiary value were seized, including stolen mail consisting of blank convenience checks; bank, credit card, and investment account statements belonging to victims residing in Potomac, Maryland; two Apple iPhones (including an iPhone X), one Apple iPad, and one HP laptop; credit/debit cards and numerous bank statements in the name of "Justina Guzman" and "Justina **OLIVERO**;" and a spiral notebook containing handwritten notes of victims' names, addresses, social security numbers, and dates of birth, including the personal identifying information ("PII") of Victim 2 and Victim 3.

15.     As part of the investigation, law enforcement officers obtained bank records for the bank, credit card, and investment account statements found at RESIDENCE 2.  Specifically, law enforcement officers obtained and reviewed statements from a BB&T Bank account ending 1898 in the name "Justina Guzman;" a Capital One Bank account ending 7013 in the name "Justina

Olivero;" a Capital One Bank account ending 8183 in the name "Justina Guzman;" a Citibank account ending 6573 in the name "Justina Olivero;" a Wells Fargo account ending 7223 in the name "Justina Guzman;" and a TD Bank account ending 4153 in the name "Justina Guzman." Twenty-three personal checks totaling $102,276.49 and involving seventeen victims were deposited into these six accounts and ACCOUNT 1 maintained by **OLIVERO**. The account holders for the 23 deposited checks were interviewed by investigators. Each account holder confirmed that the checks were stolen from the mail. Once the stolen checks were deposited, approximately $102,276.49 was subsequently depleted from the six accounts through ATM cash withdraws, online transfers, and debit card purchases.

16.   As discussed further below, even after the search of RESIDENCE 2, **OLIVERO** continued to commit mail theft, bank fraud, and aggravated identity theft. On January 23, 2020, investigators met with Victim 6 and learned that a PNC convenience check was stolen out of Victim 5 and 6's residential mailbox, located in Potomac, Maryland, and negotiated at a PNC branch located in Laurel, Maryland. Victim 5 and 6's PNC convenience check #8016 was made payable to "Justina Olivero" in the amount of $3,000. PNC Bank provided a video from January 8, 2020, showing **OLIVERO** entering the PNC Bank branch in Laurel, Maryland and cashing Victim 5 and 6's stolen convenience check #8016.

17.   On April 9, 2020, Victim 6, the wife of Victim 5, reached out to law enforcement officers to let investigators know that Victim 5 had received the following flyer in the mail advertising in-home cleaning services[2]:

_____

[2] Your affiant further notes that on March 5, 2020, the Governor of the State of Maryland declared a state of emergency in response to the spread of the novel coronavirus known as COVID-19.



18.     According to open-source records, J&J Cleaning Services is a business with a certain address in Laurel, Maryland ("RESIDENCE 3").  According to Maryland's Business Registry, the only registered agent for J&J Cleaning Services is "Justina Guzman" at RESIDENCE 3.  The Articles of Organization for J&J Cleaning Services were filed on February 4, 2020. According to subscriber records, the phone number listed on the flyer ("TELEPHONE 2") is registered to "Justina Guzman."

19.     In December 2019, Eagle Bank contacted the MCPD to report an account takeover. Victim 7, a resident of Potomac, Maryland, had an Eagle Bank account ending in 6045.  The following stolen and altered checks were drawn on Victim 7's 6045 account: (1) Check #1914, dated September 26, 2019, in the amount of $1,215.36 and made out to "Pepco," had been altered to pay "Pepco (Victim 8)"; and (2) Check #1916, dated September 2019, in the amount of $6,500 and made payable to "Royal Poinciana," had been altered to pay "Royal Poinciana (Victim 8)." In addition to the stolen checks, between October 18, 2019, and November 4, 2019, four fraudulent bank-to-bank ("ACH") transfers in the name of Victim 7 and five fraudulent ACH transfers in the

name of Victim 7's husband, Victim 9, were made to a Citibank account for $2,500.00 each.  The total loss from Victim 7's account based on the stolen checks and the fraudulent ACH transfers is $27,715.36.

20.     Eagle Bank provided investigators with recorded calls of the suspect purporting to be Victim 7 in order to take over the account.  Those two calls were made to Eagle Bank on October 17, 2019, using a certain phone number, TELEPHONE 3.  During the call, the suspect provided Victim 7's personal identification information in order to change the account settings.

21.     Investigators reviewed Citibank records for the account that received the fraudulent ACH transfers from Victim 7 and 9's account.  The signatory on the Citibank account is Victim 8 with RESIDENCE 3 as the address.  The address on this account was changed from an address in Inwood, New York, to RESIDENCE 3 on October 23, 2019.  In addition, the phone number associated with the account was TELEPHONE 3, the same number that was used to call Eagle Bank in order to unlawfully access Victim 7's Eagle Bank account.

22.     As discussed further below, Victim 8 is also a victim of **OLIVERO**'s extortion scheme.  In addition, investigators identified the following additional stolen and altered checks that had been deposited into Victim 8's account, unbeknownst to Victim 10: (1) Check #1008, dated September 26, 2019, in the amount of $2,079.02 and drawn on Victim 10's Revocable Trust Account made out to "Chase Cards" had been altered to pay "Chase Cards / Victim 8;" (2) Check #1011, dated September 26, 2019, in the amount of $700 drawn on Victim 10's account and made out to "Nordstrom" had been altered to pay "Nordstrom or Victim 8;" (3) Check #6714, dated October 4, 2019, in the amount of $1,297.50 drawn on Victim 11 and Victim 12's account and made out to "Boone and Sons," had been altered to pay "Boone and Sons / Victim 8"; and (4) a cashier's check #50873850 from the Aberdeen Proving Ground Federal Credit Union ("APG

FCU"), dated August 22, 2019, in the amount of $5,500 and made out to Victim 13, had been altered to pay Victim 8.

23.    Law enforcement officers contacted Victim 9, who lives in Potomac, Maryland. Victim 9 confirmed that Victim 9 does not know Victim 8, and that the checks were not authorized and possibly stolen from the U.S. Mail.  Law enforcement also contacted Victims 11 and 12, who live in Potomac, Maryland.  Victims 11 and 12 do not know Victim 8 and did not authorize a check to be cashed by Victim 8.  Victim 11 further stated that Victim 11 believed the Check #6714 was likely a gift meant for Victim 11's grandson.

24.    According to records obtained from APG FCU, cashier's check # 50873850 was purchased by Victim 14 and payable to Victim 13 for $5,500.  Investigators contacted Victim 14, who advised Cashier's Check # 50873850 was a payment handled by an attorney, Individual 3. As discussed further below, Individual 3 represented Victim 8 in a federal criminal investigation. In addition, Individual 3 employed **OLIVERO** at Individual 3's Law Firm 1.

25.    As part of this investigation, law enforcement officers obtained surveillance footage from Citibank of the suspect accessing Victim 8's account and conducting transactions. The suspect in that footage appears to be **OLIVERO**.  In addition, the suspect can be seen operating a newer model white SUV believed to be a Hyundai.  As discussed further below, law enforcement officers have observed **OLIVERO** driving a white Hyundai, which she parks at RESIDENCE 3.

26.    On January 24, 2020, the MCPD received a report that Victim 15, a Potomac, Maryland resident, was the victim of identity theft.  The theft occurred when a suspect attempted to gain access to Victim 15's bank account at the Atlantic Union Bank.  The suspect had called the bank and attempted to change the email address that was associated with Victim 15's account.  The

unknown suspect had Victim 15's name, home address, office address, Social Security number, account Trustee information, and bank account number.  The Atlantic Union Bank representative was suspicious and did not allow the suspect to change Victim 15's email address on file.  The suspect was able to set up online payments through "Zelle" and attempted several electronic payments to "Justina Olivero" and another individual, but the bank was able to identify and stop the theft before suffering financial loss.  The caller accessing the account requested a cashier's check made payable to "Justina Olivero."

27.     Law enforcement officers subsequently obtained the recorded calls that the suspect made to the Atlantic Union Bank.  On January 24, 2020, five calls were made to the Atlantic Union Bank call center.  During the calls, the suspect caller purporting to be Victim 15 attempted to update the email on the account to a certain email address ("EMAIL 1") and inquired about Zelle cash limits.  During the calls, the suspect caller coughed repeatedly, claimed to be in the hospital, had cancer, had a family emergency, requested a new debit card be sent to the recovery center, and at one time spoke in Spanish.  The voice on each of those calls appears to sound the same, indicating that it was the same female purporting to be Victim 15.  In addition, the voice on the calls to the Atlantic Union Bank appears to sound the same as the female voice who called Eagle Bank attempting to access Victim 7's account.

28.     As mentioned above, during the search warrant at RESIDENCE 2 on September 14, 2018, law enforcement officers seized an iPhone X belonging to **OLIVERO**.  The phone was searched pursuant to a search warrant.  The Apple ID associated with the iPhone X belonging to **OLIVERO** is the email address EMAIL 1.

29.     Capital One N.A. (Capital One), CitiBank, BB&T Bank ("BB&T"), Wells Fargo Bank ("Wells Fargo"), TD Bank, and PNC Bank are all financial institutions within the meaning of 18 U.S.C. § 20, whose deposits are federally insured by the FDIC.

*The Credit Card Fraud Scheme*

30.     In addition to stealing and altering checks, **OLIVERO** used stolen identities to order replacement American Express ("AMEX") credit cards in the names of wealthy individuals without the account holders' knowledge or consent.  **OLIVERO** then directed those credit cards to addresses associated with **OLIVERO.**

31.     In August 2017, an unknown individual purporting to be Victim 16 contacted AMEX to request an emergency card replacement ("ECR") for an account ending 5007 belonging to Victim 16.  Victim 16 is the wife of a CEO of an international investment bank.  The unknown individual called AMEX using a certain phone number ("TELEPHONE 4").  At the request of the unknown individual, AMEX issued an ECR in **OLIVERO**'s name, using a shipping address in Laurel, Maryland ("RESIDENCE 4")

32.     According to FedEx records, the fraudulent ECR, tracking # 740993480231, was delivered to RESIDENCE 4 on August 16, 2017.  Leasing documents obtained during the investigation indicated **OLIVERO** resided at RESIDENCE 4 on that date.  AMEX advised that the ECR that was sent to RESIDENCE 4 had an unlimited credit limit.

33.     In January 2018, an unknown individual using TELEPHONE 1 contacted AMEX in order to add **OLIVERO**'s name to Victim 16's account ending 1014.  After **OLIVERO**'s name was added, the unknown individual requested another ECR.  AMEX issued the ECR ending in 2012 and delivered it, via FedEx, to RESIDENCE 1.  According to FedEx records, the package containing the new ECR was received and signed for by "Olivero."  An AMEX investigator

11

advised this card had an unlimited credit limit. Leasing documents obtained during the investigation indicated that **OLIVERO** resided at RESIDENCE 1 during the time the fraudulent AMEX card was delivered.

34.     AMEX determined that additional ECRs associated with accounts belonging to Victim 17 and Victim 18 were sent to RESIDENCE 1. In January 2018, seven emergency replacement cards for Victim 17's accounts ending 4007, 6004, 5006, 6002, 7000, 6004, and 8000 were shipped to RESIDENCE 1. The phone number used to request those ECRs was TELEPHONE 1, which also was the same phone number used to request the ECR associated with Victim 16's account. AMEX advised that five of the ECRs that were sent had an unlimited credit limit, and two of the ECRs that were sent had credit limits of $14,500 each. Additionally, in March 2018, AMEX determined that a person using TELEPHONE 1 had requested an ECR for the account ending 2005 belonging to Victim 18. The ECR was shipped to **OLIVERO**'s address at the time, RESIDENCE 1, via FedEx 4362276846635. AMEX advised this card had an unlimited credit limit.

35.     TELEPHONE 1, captured by AMEX, is the same number provided by **OLIVERO** during her interview with law enforcement on September 14, 2018. In addition, this number was the same number assigned to the iPhone X seized during the search warrant at **OLIVERO'S** residence, RESIDENCE 2, in September 2018.

36.     Law enforcement officers identified a second phone number associated with **OLIVERO** that was also used to request ECRs. According to MCPD Pawn Unit records, **OLIVERO** used her name, a certain phone number ("TELEPHONE 5"), and RESIDENCE 3, to pawn a Cuban necklace with an angel pendant on February 7, 2020.

37.     According to AMEX records, between March 9, 2019, and January 14, 2020, AMEX received approximately 181 calls from TELEPHONE 5. Those phone calls resulted in at least six ECRs being issued and mailed to RESIDENCE 3.

### The Extortion Scheme

38.     Law Firm 1 is a law firm located in Montgomery County, Maryland, that provides various legal services, including criminal defense. Individual 3 is a lawyer working at Law Firm 1. In 2018, **OLIVERO** was a client of Law Firm 1. According to Individual 3, **OLIVERO** agreed to work at Law Firm 1 in exchange for legal services from Law Firm 1 and Individual 3.

39.     During the Fall of 2018, and as part of her arrangement with Law Firm 1 and Individual 3, **OLIVERO** worked at Law Firm 1 and performed administrative duties such as filing client documents, picking up legal documents from court, and converting paper client files to digital format. Additionally, **OLIVERO**, who is a fluent Spanish speaker, provided informal translation services to assist Individual 3 with Law Firm 1's Spanish speaking clients.

40.     Unbeknownst to Law Firm 1 or Individual 3, **OLIVERO** used her employment with Law Firm 1 to hold herself out as an attorney in order to fraudulently obtain money from Victim 8 and Victim 19.[3] Victim 8 was a client of Law Firm 1. Since Victim 8 and her spouse, Victim 19, both speak Spanish as their primary language, **OLIVERO** provided informal translation services for Individual 3 when Individual 3 met with Victim 8 and Victim 19. Obtaining the contact information for Victims 8 and 19 as part of her employment, **OLIVERO** held herself out as an attorney and told Victims 8 and 19 that she had specific knowledge of the legal system. Specifically, **OLIVERO** told Victims 8 and 19 that in exchange for money,

---

[3] **OLIVERO** is not licensed to practice law in the State of Maryland.

**OLIVERO** could: (1) get Victim 8 relocated to another detention facility; (2) assist Victim 19 with immigration issues; and (3) assist Victim 19 with child support issues. **OLIVERO** further directed Victim 19 to send **OLIVERO** certain personal identifying information including passports and banking information. In exchange for allegedly providing these legal services, **OLIVERO** manipulated Victim 19 into paying **OLIVERO** money. In total, as part of this scheme, Victim 8 and Victim 19 provided approximately $13,000 in payments directly to **OLIVERO**.

41.     **OLIVERO** communicated with Victim 19 using the encrypted communication service "WhatsApp." **OLIVERO** used the WhatsApp screen name "Justina Maryland" and TELEPHONE 5. As set forth above, the phone number associated with the WhatsApp screen name "Justina Maryland" is the same phone number that **OLIVERO** used to obtain the fraudulent AMEX ECRs.

42.     As part of this investigation, law enforcement officers obtained the WhatsApp communications between **OLIVERO** and Victim 19.[4] **OLIVERO** communicated with Victim 19 about Victim 8's immigration status and about payments for purported legal services **OLIVERO** claimed she had performed. **OLIVERO** also provided fabricated court documents to make it appear to Victim 19 as if **OLIVERO** had actually performed the services. For instance, **OLIVERO** directed Victim 19 to send Victim 8's immigration documents to **OLIVERO** at a certain Gmail address ("EMAIL 2"). **OLIVERO** told Victim 19 that **OLIVERO** could obtain asylum for Victim 8 for a fee. WhatsApp communications show that Victim 19 shared pictures of

---

[4] Your Affiant notes that the WhatsApp communications referenced herein were primarily in Spanish. Where referenced in this affidavit, summaries of those communications rather than word-for-word interpretations are provided.

Victim 8's passport, driver's license with **OLIVERO**. According to records from U.S. Citizenship and Immigration Services, Victim 8's asylum application was rejected on August 5, 2019. Even after Victim 8's application was rejected, **OLIVERO** continued to make representations to Victim 8 and Victim 19 that **OLIVERO** was working on Victim 8's immigration status.

43.     On August 1, 2019, **OLIVERO** asked Victim 19 for $3,000 to pay for attorney services related to moving Victim 8 to another detention facility. **OLIVERO** falsely claimed that the funds were necessary to submit a petition to the jail in order to have Victim 8 moved. When Victim 19 responded to **OLIVERO** that Victim 19 did not have the money, **OLIVERO** told Victim 19 to pay half of the money and claimed that **OLIVERO** would swear in front of a judge that the remaining money would be paid at some point in the future. **OLIVERO** provided Victim 19 with a Bank of America account number ending in 7115 and instructed Victim 19 to put **OLIVERO**'s name on the payment and RESIDENCE 3 as the address. **OLIVERO** confirmed to Victim 19 that **OLIVERO** had submitted the petition.

44.     On August 3, 2019, **OLIVERO** contacted Victim 19 through WhatsApp and claimed that the jail was asking for additional money to allow visits.

45.     On August 6, 2019, **OLIVERO** provided Victim 19 a picture of a fabricated document (below) for "inmate transfer" that references "Attorney Justina Olivero" and a remaining payment. In August 2019, there was no attorney licensed to practice law in the State of Maryland with the name Justina Olivero.



46.     That same day, on August 6, 2019, Victim 19 asked **OLIVERO** how much money Victim 19 still owed. **OLIVERO** then provided another picture of a fabricated document (below) purporting to be a jail transfer receipt. The document purports to be for the case United States of America v. Victim 8, and includes Spanish and English wording, and references a payment of $1,500 on August 1, 2019, an outstanding balance of $1,500, and a final date of payment in the presence of a judge on August 7, 2019.   Moreover, based on my training, experience, and conversations with the U.S. Marshals Service, an individual cannot pay a court or a detention facility to have prisoners relocated.



47.     On August 7, 2019, in order to confirm payment, via WhatsApp, Victim 19 sent **OLIVERO** pictures of two Money Gram receipts totaling $1,500 (below).  Both receipts show payments were made to "Justina Guzman," a known alias of **OLIVERO**, on August 7, 2019, with the address of RESIDENCE 3:

17



48.     As part of this investigation, law enforcement officers obtained bank records for the Bank of America account ending in 7115 in the name of **OLIVERO**. Law enforcement officers identified twelve transactions from August 1, 2019, through September 11, 2019, totaling $8,200 sent from Victim 8 directly to **OLIVERO**'s Bank of America account ending 7115. According to Victim 19, these payments were for legal services that **OLIVERO** claimed to have

provided to Victim 8 and Victim 19.  The statements for **OLIVERO**'s Bank of America account show no indication the funds were used for Victim 8 or Victim 19's benefit.

49.      During a meeting with law enforcement officers on October 11, 2019, Victim 19 related that **OLIVERO** asked for Victim 8's bank and credit card information.  **OLIVERO** told Victim 19 that she needed the bank information to look into things and see how things were in the account.  Victim 19 said **OLIVERO** never stated why she needed the bank account information. Victim 19 advised he sent Victim 8's account information and cards to **OLIVERO**.  Investigators identified Victim 8's account was with Citibank.  This is the account that **OLIVERO** used to deposit stolen checks and receive fraudulent ACH transfers from Victims 7, 9, 10, 11, 12, and 14.

50.      On October 11, 2019, in the presence of law enforcement officers, Victim 19 placed a recorded call to **OLIVERO** at TELEPHONE 5.  Victim 19 identified that the voice of the female on the recording was that of **OLIVERO**.  During the conversation, **OLIVERO** told Victim 19 that Victim 8's immigration case had been confirmed, but that Victim 19 would not receive any paperwork.  Finally, **OLIVERO** said Victim 19's child support case would be resolved and that they had an appointment with the judge on December 1, 2019.  Law enforcement officers confirmed with the Nassau County, New York, Courthouse that there was no court date scheduled for Victim 19's child support case.

51.      On November 7, 2019, Victim 19 engaged in a controlled meeting with **OLIVERO**, in which law enforcement maintained physical surveillance over the two parties and obtained recorded conversation.  During the conversation, **OLIVERO** told Victim 19 that the judge had been paid $5,000 to reinstate Victim 19's driver's license, which had been revoked for not paying child support in Nassau County, New York.  **OLIVERO** also said Victim 8's asylum

request had been approved already, but she needed Victim 8's assistance in filling out a questionnaire so they could complete the paperwork.

52.     In fact, as of May 28, 2020, law enforcement confirmed with Victim 19 that Victim 19's driver's license has not been reinstated, and that Victim 8 has not been granted asylum status in the United States.

## **CONCLUSION**

53.     Based on the facts set forth above, I respectfully submit that there is probable cause to believe that **OLIVERO** violated 18 U.S.C. §§ 1344, 1343, 1028A, and 1708.


_____
Detective Michael Adami
Montgomery County Police Department


Affidavit submitted by email and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this ___1st___ day of July 2020.

_____
Honorable Gina L. Simms
United States Magistrate Judge